## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Case No.:** |
| **AMERATEX ENERGY, INC., LEWIS** | § | |
| **OIL CORPORATION, LEWIS OIL COMPANY,** | § | |
| **THOMAS A. LEWIS, WILLIAM R. FORT,** | § | |
| **DAMON L. FOX, and BRIAN W. BULL,** | § | |
| | § | |
| **Defendants** | § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against Defendants AmeraTex Energy, Inc. ("AmeraTex"), Lewis Oil Corporation ("Lewis Oil Corp."), Lewis Oil Company ("Lewis Oil Co."), Thomas A. Lewis ("Lewis"), William R. Fort ("Fort"), Damon L. Fox ("Fox"), and Brian W. Bull ("Bull") (collectively, "Defendants") and would respectfully show the Court as follows:

### I.   SUMMARY

1.      Lewis owns and controls AmeraTex, Lewis Oil Corp., and Lewis Oil Co.  Since at least February 2013, these companies have raised approximately $11.7 million from more than 150 investors in at least 36 states by primarily selling, through 13 offerings, interests in limited partnership oil drilling and operations programs in Kentucky.  In offering documents and other communications to investors, Lewis and Fort, who served as President of AmeraTex in 2013 and 2014, made a variety of materially misleading statements and omissions, concerning:

- Use of investor proceeds;

- Financial statements;
- Location and production of wells;
- Sales commissions;
- Comingling and loaning investor funds;
- Lewis's supposed military service; and
- Significant related-party interests and involvement.

2.      Fox and Bull played key roles in the fraudulent scheme by, among other things, adding an aura of legitimacy to Lewis's operations. Fox served as the accountant for several limited partnerships and knowingly diverted investor funds for his and Lewis's personal use. Fox also prepared false tax forms for investors that concealed the true financial state of the partnerships. Similarly, in his role as AmeraTex's Compliance Coordinator, Bull reviewed and revised many of the misstatements to investors, enabled the solicitation and acceptance of unqualified investors, and filed false Forms D with the Commission.

3.      Defendants made material misrepresentations and omissions and engaged in a continuous scheme to misappropriate investor monies to enrich themselves and others, including Lewis, who personally received almost $2 million of investor funds. Lewis and Fort also employed Internet search suppression services to hide online investor and employee complaints, and paid undisclosed sales commissions through hidden entities that Fox misleadingly categorized in the books and records. None of the securities offerings were registered with the Commission, and none of the individuals who were paid to sell the securities, including Lewis and Fort, were licensed or associated with registered brokers.

4.      Based on their conduct, Defendants AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, and Fox violated the antifraud provisions of the federal securities laws, specifically Section 17(a) of the Securities Act of 1933 (the "Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder. Also, Defendant Fox aided and abetted AmeraTex's, Lewis Oil Corp.'s, Lewis's, and Fort's antifraud

violations.  Additionally, Defendants AmeraTex, Lewis, and Fort violated Sections 5(a) and 5(c) of the Securities Act by selling unregistered securities, and Defendant Bull aided and abetted AmeraTex's, Lewis's, and Fort's violations of Sections 5(a) and 5(c).  Defendants Lewis and Fort also violated Section 15(a) of the Exchange Act.  Finally, Defendant Bull violated Section 17(a)(2) of the Securities Act.  Unless Defendants are enjoined by the Court, they will continue to fraudulently offer and sell securities in violation of the federal securities laws.

5.      To protect the public from any further fraudulent activity and harm, the Commission brings this action against Defendants seeking: (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains resulting from Defendants' violations of the federal securities laws; (iii) accrued prejudgment interest on those ill-gotten gains; and (iv) civil monetary penalties.

## II.      JURISDICTION AND VENUE

6.      Defendants offered and sold purported limited partnership interests, joint venture interests, and fractional undivided interests in oil and gas, all of which are securities, either because they are defined as securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)] or because they are investment contracts, which are defined as securities.

7.      The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].  The Commission seeks the imposition of civil penalties pursuant to Section 20(d)(2)(C) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3)(B)(iii) of the Exchange Act [15 U.S.C. § 78u(d)].

8.      This Court has jurisdiction over this action under Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and under Sections 21 and 27 of the Exchange

Act [15 U.S.C. §§ 78u and 78aa], because Defendants directly or indirectly made use of the means or instrumentalities of commerce and/or the mails in connection with the transactions described herein.  Venue is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of Defendants' acts, practices, transactions, and courses of business alleged herein occurred within this judicial district.

## III.   DEFENDANTS

9.      AmeraTex is a Texas corporation incorporated in 2006 that was located in Plano, Texas at all relevant times.

10.     Lewis Oil Corp. is a Nevada corporation incorporated in 2011 that was located in Plano, Texas at all relevant times.

11.     Lewis Oil Co. is a Texas corporation incorporated in 2015 that was located in Plano, Texas at all relevant times.

12.     Thomas A. Lewis ("Lewis"), age 52, currently resides in Albany, Kentucky. Lewis serves as CEO of AmeraTex, Lewis Oil Corp., and Lewis Oil Co.  Lewis previously held Series 22 & Series 63 securities licenses (CRD #53355810) that lapsed in 2009.  Lewis is currently participating in a pre-trial diversion program in Collin County, Texas for a June 2016 felony cocaine possession offense.

13.     William R. Fort ("Fort"), age 51, currently resides in Greenville, Texas.  Fort served as AmeraTex's Vice President and Director of Operations from November 2008 to July 2013, and then served as its President from July 2013 to October 2014.

14.     Damon L. Fox ("Fox"), age 45, currently resides in Rowlett, Texas.  Fox served as an accountant to AmeraTex and Lewis Oil Corp. from Fall 2009 to Spring 2017.  Fox is the

sole owner of DNDS Consulting, Inc., which provides accounting, tax preparation, and bookkeeping services to entities and individuals. Fox is not, and has never been, a licensed CPA.

15.    Brian W. Bull ("Bull"), age 56, currently resides in Dallas, Texas. Bull served as Compliance Coordinator for AmeraTex and Lewis Oil Corp. from April 2011 to July 2017. Bull previously held Series 7, 24, 63, and 65 securities licenses (CRD #2908806) that lapsed in 2012.

## IV.    FACTS

16.    Since February 2013, AmeraTex, Lewis Oil Corp., and Lewis Oil Co.—all entities Lewis controlled—raised approximately $11.7 million from more than 150 investors nationwide by selling interests in oil and gas projects. These entities derived virtually all of their income from investor funds.[1] The AmeraTex, Lewis Oil Corp., and Lewis Oil Co. offerings at issue in this lawsuit are detailed as follows:

| Managing General Partner | Number of Offerings | Approx. Amount Raised | Approx. Investors | Defendants Involved |
|---|---|---|---|---|
| AmeraTex | 8 | $2.8 million | 90 | Lewis, Fort, Fox, Bull |
| Lewis Oil Corp. | 4 | $8.8 million | 75 | Lewis, Fox, Bull |
| Lewis Oil Co. | 1 | $100,000 | 1 | Lewis |
| | | | | |
| **Total** | **13** | **$11.7 million** | **166** | |

## A.    AMERATEX OFFERINGS.

17.    Lewis became AmeraTex's CEO and President in 2008. Since at least 2009, AmeraTex has served as managing general partner ("MGP") for various limited partnerships formed to drill and rework oil wells in Kentucky. During its operations, AmeraTex had approximately 50 employees, including roughly 20 salespeople. Since February 2013,

---

[1] The partnerships and projects pitched to investors produced nominal returns and, in many cases, consistently lost money.

AmeraTex has sold interests in eight limited partnerships, raising $2.8 million from at least 90 investors ("AmeraTex Offerings").

18.     AmeraTex identified and solicited potential investors through purchased "lead sheets" and an aggressive nationwide cold-calling campaign. AmeraTex salespeople possessed two titles: Prospect Reps ("PRs") and "Closers." PRs made the initial cold-calls, vetted interest in a project, and then connected the prospective investor with a Closer. Closers then asked questions regarding accreditation, sent out written offering materials including private placement memoranda ("PPM"), and followed up until AmeraTex received a check and completed subscription documents. To avoid registration requirements in connection with the use of salespeople, Fort and Lewis provided Closers with meaningless vice-president titles. These titles were in name only and did not reflect the Closers' primary job duties of selling interests to investors. Lewis and Fort were in positions to know AmeraTex solicited and accepted non-accredited investors.

19.     Lewis and Fort supervised the AmeraTex sales team and personally solicited investors. Although they assigned most cold-calling to various salespeople, Lewis and Fort supervised these efforts and led meetings with sales staff to discuss the details and selling points of the AmeraTex Offerings. Further, Lewis and Fort regularly communicated with investors, sent them sales materials, and participated in closing calls. The AmeraTex sales staff, including Fort, received 10% sales commissions based on closed investments – split 80/20 among Closers and PRs. Attempting to avoid registration requirements in connection with the payment of commissions, Lewis forbade sales staff from calling these payments "commissions" and instead directed salespeople to call them "bonuses." Bonuses ranging from $500-$5,000 were also given

to non-sales employees based on how much and how quickly investor funds were raised in offerings.

20.     Fort served as Vice President and Director of Operations of AmeraTex from November 2008 to July 2013 and then replaced Lewis as President from July 2013 to October 2014, when he left the company.  In both roles, Fort was a signatory on nearly all AmeraTex and partnership bank accounts and signed checks on several occasions.  Fort's primary duties involved drafting offering materials, managing the sales team, and soliciting investors.  Fort provided investors with offering materials and discussed the investment with them over the phone and via email.  In emails and phone calls with investors, Fort provided estimates for well production and sometimes guaranteed a return percentage.

21.     All of the AmeraTex Offerings involve the same type of securities—limited partnership interests—which were purchased by investors with the same type of consideration, cash.  Although the AmeraTex Offerings started and ended at different times, they were offered in a continuous, serial manner, such that a new offering was opened shortly after the prior one was funded, and in several cases, even before.  All of the AmeraTex Offerings purported to have the same general purpose: to drill, complete, equip, test, rework, and operate oil wells in Kentucky.

22.     Purchasers of the limited partnership units sold via the AmeraTex Offerings had limited liability and had no power to take an active role in any of the partnerships.  For instance, AmeraTex's PPMs explicitly authorized AmeraTex to manage the day-to-day affairs and operations of the partnerships, including the power to either hire or replace the operator, and to drill, complete, equip, test, rework, operate, recomplete and even plug certain wells—all without

input from investors. AmeraTex retained sole discretion to substitute prospect wells for other wells or to abandon or substitute a drill site.

23.     Lewis told Bull he hired him to instill an environment of compliance at AmeraTex. As AmeraTex's Compliance Coordinator, Bull trained the sales staff about, among other things, the purported importance of accreditation. He was also responsible for reviewing all investor subscription documents for completeness and accreditation. However, AmeraTex had no process in place to verify accredited status beyond the mere representation of the investor. In fact, Fort specifically included language in the subscription documents that did not require investors to include information about their net worth, salary, or financial holdings "for reasons of financial privacy." Bull knew this, disagreed with it, and admitted this language was included so that AmeraTex would be able to close more investors. Nonetheless, Bull made no effort to seek documentation from investors to support their claimed accredited status.

24.     Moreover, Bull knew AmeraTex solicited and accepted non-accredited investors. Bull received numerous subscription documents that were incomplete and others that plainly indicated that investors were not accredited. In fact, Bull has admitted reviewing investor documents where the net worth of an otherwise unqualified investor was falsified and forged by a member of the AmeraTex sales staff. Bull, however, did not reject any investor. Instead, he simply informed Lewis or Fort of deficiencies and advised them to reject the investor. Further, Bull did not withhold the investors' checks from being deposited and he never followed-up to ensure unaccredited investors were rejected or their checks were sent back (and they were not).

25.     Many investors were also unsophisticated and stated in their subscription agreements that they had no education, no private investment experience, and no oil and gas investment experience sufficient to evaluate the merits and risks of an AmeraTex investment.

Neither AmeraTex nor any individual at AmeraTex provided non-accredited investors with audited financial statements or balance sheets.

26.     Despite knowing that no registration exemptions applied and that AmeraTex engaged in general solicitations and accepted unaccredited and unsophisticated investors, Bull filed Forms D for at least seven AmeraTex offerings claiming exemptions under Rule 506 of Regulation D.   He also knew that AmeraTex paid its salespeople commissions, even though he filed Forms D claiming "$0" in paid sales commissions.

27.     Fox provided accounting services to AmeraTex and was paid directly and through his entity, DNDS.  Fox managed all of the partnerships' books and records, as well as those of AmeraTex in its role as MGP.  Fox also prepared the tax returns for every entity and K-1 statements for all investors.

28.     In 2013, Lewis fired the previous operator of all AmeraTex oil and gas projects and hired SWO&ISM[2]—a company co-owned, controlled, and operated by his convicted-felon brother David Lewis—to drill and operate all current and future AmeraTex and Lewis Oil Corp. projects.  SWO&ISM overcharged the partnerships for operating expenses, often failed to perform contracted work, and purportedly embezzled more than $1 million from a transportation company venture with Lewis Oil Corp. investors.

29.     Also in 2013, Lewis divorced from his wife, leading to an increased use of alcohol and drugs and lavish purchases, including frequent visits to strip clubs and similar services, all furnished by investor monies.

---

[2] SWO&ISM stands for "Steve Wallace Operating" (owned by Steve Wallace) and "Insight Management" (owned by David Lewis (brother to Tom Lewis) and his wife, Monica Ticer).  Together, Wallace, David Lewis, and Ticer co-managed SWO&ISM.  David Lewis's name and involvement was absent from all official SWO&ISM documents because he was convicted in 2000 of felony securities fraud and conspiracy to commit mail fraud in connection with oil and gas offerings.  David Lewis was indicted again on similar charges in June 2012, convicted in September 2013, and sentenced to 30 years in prison.  Defendants failed to disclose David Lewis's criminal record as well as his involvement in SWO&ISM to investors in AmeraTex and Lewis Oil.

30.     AmeraTex projects were not economically successful, with investors receiving zero to very nominal returns.  Investor complaints arose as increasing numbers of projects failed to provide any returns.  To minimize the effects of these complaints, Lewis and Fort paid $2,500 per month for 22 months for Internet search suppression services.[3]

**B.     DEFENDANTS AMERATEX, LEWIS, FORT, AND FOX MADE MATERIAL MISREPRESENTATIONS AND OMISSIONS IN CONNECTION WITH THE OFFER, PURCHASE, AND SALE OF AMERATEX SECURITIES.**

31.     AmeraTex used several offering documents to market and sell investments in the AmeraTex offerings, including a PPM, an Executive Summary, and a Geology Booklet ("Geo Book") (collectively, the "Offering Documents").  Lewis and Fort drafted AmeraTex's Offering Documents and Bull reviewed and revised them.  Working together, Lewis and Fort conceptualized the offering parameters and PPM content, drafted and edited the PPMs, and authorized the distribution of the AmeraTex Offering Documents to investors.  These materials were substantially similar for all eight AmeraTex offerings.  Lewis, Fort, and Bull also drafted, reviewed, and edited subsequent update letters and other investor communications, with Lewis having final approval.

32.     The AmeraTex Offering Documents contained materially false and misleading statements and omissions.  Additionally, Lewis and Fort made materially false and misleading statements, and omitted material information, in direct oral and written communications with AmeraTex investors.  Based at least in part on these false statements, AmeraTex was able to raise $2.8 million, from which Lewis received nearly $905,000 from 2013 through 2016.

---

[3] Whereas search engine *optimization* is the process of improving online visibility of a website, entity, or person, Internet *suppression* does the opposite.  Lewis and Fort paid a third-party service provider to relegate negative reviews and commentary about them and their business and make them *less* visible and identifiable to users of Internet search engines.

1.    **Misrepresentations Regarding Use of Investor Proceeds, Commission Payments, and Comingling and Loaning of Funds.**

33.    The PPMs for the AmeraTex Offerings contained a false and misleading use-of-proceeds chart for each of the eight offerings.  Although the dollar amounts sometimes fluctuated from program to program, the percentage breakdown was typically similar to the example below from the Cumberland Development offering in January 2014:

| Use of Proceeds | | |
|---|---|---|
| | Amount | Percent |
| Organizational Costs | $72,150 | 13.00% |
| Sales Commissions[4] | $55,000 | 10.00% |
| Property Acquisition Costs | $49,950 | 9.00% |
| *Total to MGP* | | *32.00%* |
| Drilling and Completion Costs | $377,400 | 68.00% |
| | | |
| **Total** | **$555,000** | **100.00%** |

34.    The PPMs stated that the maximum percentage of funds that would be used by AmeraTex (the MGP) ranged from 30-36%, depending on the project.  In reality, however, AmeraTex appropriated between 35-80% of investor funds in all offerings.  Additionally, the funds actually spent on drilling and completion costs were usually half the amount disclosed.  Further, the use-of-proceeds charts did not disclose that Lewis would use investor funds for personal withdrawals and debit card spending.  For instance, the actual use of proceeds for the Cumberland Development offering was as follows:

| Actual Use of Proceeds | | |
|---|---|---|
| | Amount | Percent |
| Total to MGP AmeraTex | $233,719 | 36.00% |
| Drilling and Completion Costs (funds sent to AmeraTex's operator, who never drilled the wells promised) | $190,000 | 29.3% |
| Lewis Personal Cash Withdrawals | $9,100 | 1.4% |
| Other Cash Withdrawals with No Apparent Business Purpose related to the Cumberland project | $216,240 | 33.3% |
| | | |
| **Total** | **$649,059** | **100.00%** |

---

[4] Included a footnote that AmeraTex will only pay Sales Commissions to registered Broker-Dealers and to the extent AmeraTex's officers, directors, and employees sell units, amounts allocated to Sales Commissions will be used for AmeraTex's working capital.

35.     PPMs for the AmeraTex Offerings also guaranteed investors that "no loans or advances may be made by the Partnership to the MGP or any of its affiliates." However, from 2013 through 2016, Lewis repeatedly comingled partnership funds with those from other offerings in the MGP accounts and then loaned the funds to his entities and partnerships to cover the costs of various items—unrelated to the specific AmeraTex partnerships for which the funds were raised. For instance, Lewis used AmeraTex's Parrish Sands partnership funds to pay $15,000 in costs for litigation in which LOTS (a Lewis Oil Corp. investment) was the named defendant. This was done without any permission or disclosure to investors and in direct contradiction to the representations in the PPM. Further, Bull and Fox knew that AmeraTex comingled investor funds and made undisclosed loans. For instance, both Bull and Fox received monies directly from some of the partnership entities and from other entities for which they did not work and from which they were not entitled to any payments.

36.     The PPMs for the AmeraTex Offerings also falsely stated that sales commissions would be paid "only to registered broker dealers participating in the sale of the units." However, none of AmeraTex's salespeople were registered brokers or associated with a registered entity. The PPMs' use-of-proceeds charts further represented that if "AmeraTex officers, directors, or employees sell Units, amounts allocated to Sales Commissions may be used by AmeraTex for working capital or to acquire an interest in additional drill site(s)." Yet AmeraTex salespeople received commissions of up to 10% of each investment. AmeraTex, Fort, and Lewis attempted to keep these commission payments "off the books" by paying commissions to salespeople through entities or DBAs that Fort and Lewis required each salesperson to set up rather than

paying them directly to the salespeople through the AmeraTex payroll system.[5]  Knowing that these transaction-based payments were actually sales commissions, Fox misleadingly booked these payments as consulting fees or lease operating expenses in the books of the partnership and MGP.

### 2.      Misrepresentations Regarding Well Data and Locations.

37.      Offering Documents distributed by AmeraTex in 2016 for its last partnership,[6] Parrish Sands, included a Geo Book that featured a purported "map of the lease."  This map contained production data for wells that AmeraTex claimed were located near the prospect wells in Cumberland County, Kentucky.  However, this information was false.  The production data for four of the eleven comparison wells was either inflated or falsified to conceal dry or noneconomic wells, as reflected in the chart below:

| Well Name | County Location | Initial Production Claimed in AmeraTex Offering Materials | Actual Initial Production Per Public Records |
|-----------|-----------------|----------------------------------------------------------|----------------------------------------------|
| BL 103    | Clinton         | 42 BBLs                                                  | N/A – dry hole                               |
| BL T7     | Monroe          | 30 BBLs                                                  | 2 BBLs                                        |
| BL T8     | Monroe          | 15 BBLs                                                  | N/A – dry hole                               |
| ST-102    | Clinton         | 23 BBLs                                                  | 5 BBLs                                        |

### 3.      Verbal Misrepresentations and False Guarantees by Defendants Fort and Lewis.

38.      In a Summer 2014 phone call, Fort guaranteed one Cumberland Development investor a return of his investment in six months and represented that one well was already producing 50 barrels per day.  However, the investor never received a single dollar from the AmeraTex partnership.  Fort promised this same investor that he would not lose any of his

---

[5] For instance, at the direction of Lewis and Fort, salesperson Billy Cooper set up an entity named "BC Cooper Consulting" and received at least $46,000 in sales commissions in 2013.  Similarly, salesperson Robert Befeld set up an entity called "Befeld Consulting" and received at least $71,000 in sales commissions from January 2013 through May 2014.

[6] Fort had departed the company and was apparently not involved in this offering or these misstatements.

money, yet the wells for the Cumberland partnership were never drilled and the investor received no returns.

39.     In a July 13, 2014 email exchange with an AmeraTex investor in the Kettle Creek Development prospect, Fort represented, "I truly meant it when I talked to you about that lease, it is probably the best lease I have ever drilled on in my entire career." In reality, neither Fort nor AmeraTex ever drilled wells for the Kettle Creek prospect, and bank records reveal that AmeraTex did not spend a single dollar on drilling and completing the Kettle Creek wells. Instead, 81% of Kettle Creek investor funds were used by AmeraTex for organizational costs (as compared to the 32% authorized in the PPM), and 18% of the funds went to Lewis personally or were withdrawn as cash without an apparent business purpose.

40.     To secure an investment from a Navy veteran in 2012, Lewis claimed to have served in the Marines. However, Lewis has never served in the military. Nonetheless, Lewis perpetuated this lie in numerous subsequent phone calls, and the investor made additional investments in Summer 2013 in Lewis Oil Corp.'s Integrality offering and in April 2016 in AmeraTex's Parrish Sands offering. To secure another Parrish Sands investor, Lewis represented via phone in Summer 2016 that two wells associated with the Parrish Sands project were already producing 50 to 100 gallons of oil per day. This was false and the investor never received a single dollar.

41.     Lewis repeatedly referred to Fox as his "CPA" in oral and written communications with investors from 2013 through 2016. Lewis made this claim even after learning in 2014 that Fox was not, and had never been, a CPA. Indeed, Fox knew Lewis regularly described him as his CPA to investors, yet never corrected Lewis or advised investors that he was not a CPA.

### 4.     False Tax Returns and K-1 Statements Prepared by Defendant Fox.

42.     Fox prepared tax returns for AmeraTex and all AmeraTex-managed partnerships, as well as all investor K-1 statements, based on the books and records that he maintained.  At Lewis's direction, Fox transferred large amounts of investor funds from partnership accounts to AmeraTex and other entities.  Fox did not disclose or account for the personal spending of investor funds by Lewis and Fort, and he mischaracterized unauthorized commission payments in addition to payments to his own entity, Consolidated Energy Ltd., [7] as consulting fees or lease operating expenses.  As a result, Fox prepared and sent K-1 statements to investors each year from 2013 to 2016 for at least eight partnerships which misstated and over-reported the financial health of the partnerships and the true status of the investors' investment positions.

43.     More specifically, the false K-1 statements did not accurately reflect the partnerships' income and expenses, the investors' distributions, the available intangible drilling expense (IDE) deductions, and the investor capital accounts.  For example, for the Knox Exploration offering, the statements Fox sent to investors inaccurately stated that the partnership made a $7,000 profit in 2014 when, in reality, it suffered a $50,000 loss.  Similarly, in the J. Aaron offering, the 2013 statements prepared by Fox and sent to investors reflected no gains or losses for the partnership and inflated the deductions available for intangible drilling expenses. In reality, the partnership had lost $530,000 and the deduction available for intangible drilling expenses was much lower than Fox stated.  At least one J. Aaron investor made the decision to

---

[7] Fox and Lewis used a shell entity they set up in 2010, Consolidated Energy Ltd. ("Consolidated"), to siphon more than $390,000 from AmeraTex and Lewis Oil Corp. partnership accounts throughout 2013 and 2014.  Consolidated had no business operations; it was funded entirely by investor funds from AmeraTex MGP accounts, AmeraTex partnership accounts, Lewis Oil Corp. partnership accounts, and Lewis Oil Corp. MGP accounts.  Lewis and Fox both had debit cards linked to the Consolidated account and used those funds for personal expenses.  On bank documents, Lewis was listed as "President" of Consolidated and Fox was listed as its "Vice President."

invest in a second AmeraTex partnership, Cumberland Development, approximately one month after receiving a falsely optimistic K-1 statement.

44.     AmeraTex annually distributed Fox's false K-1 statements to investors. Approximately one quarter of all AmeraTex investors in 2013 and 2014 were repeat investors. Over the same time span, there were at least five consecutive or overlapping AmeraTex offerings.  As such, existing investors received Fox's false financial statements during the pendency of additional AmeraTex offerings for which they were being solicited.  AmeraTex and Fox made material misrepresentations to existing investors while AmeraTex was soliciting them and other investors on new AmeraTex offerings.

**5.     False and Misleading Statements about Lewis's Relocation.**

45.     The AmeraTex partnerships produced little to no returns, primarily because of Defendants' misuse and misappropriation of funds and their fraudulent conduct.  As investor complaints increased, Lewis drafted (and Bull edited) two separate January 2014 "general update" letters that were sent to all AmeraTex and Integrality (Lewis Oil Corp.) investors.  In these letters, AmeraTex claimed that Lewis "ha[d] relocated" from AmeraTex's headquarters in Plano, Texas to Albany, Kentucky so he could closely monitor the operations of the projects, which were all located in Kentucky.  Seeking to address investor concerns and regain their trust, Lewis stated: "By making this commitment . . . I have immediate access to everything necessary [ ] to begin to turnaround our wells."  However, Lewis and Bull knew these representations were not true because Lewis did not relocate to Kentucky until 2017.

**C.     LEWIS OIL CORP. OFFERINGS**

46.     Lewis formed Lewis Oil Corp. in 2011.  Lewis asked many AmeraTex employees, including Fox, Bull, and several AmeraTex closers, to perform the same job

functions for Lewis Oil Corp. that they performed for AmeraTex.  Between 2013 and 2016, Lewis and Lewis Oil Corp. conducted the offerings as described further below: Integrality, Additional Integrality and Prepay program Offerings, Illinois Investor Offering, and NRG Oil Offering ("Lewis Oil Corp. Offerings").

47.     In 2012, Lewis decided to start a transportation company with SWO&ISM, David Lewis's company.  In February 2013, Lewis Oil Corp. began offering interests in a limited partnership called Integrality, ultimately raising $6.5 million from investors.  As represented to investors in the PPM and cover letter, Integrality was to purchase a 49% ownership interest in Hein Oil Gathering and Transport ("HOGT"), which had contracted to acquire the assets of Coomer Transportation – an existing oil transport company in Kentucky – for $2.75 million. The other 49% owner was SWO&ISM.  The remaining 2% was owned by a third-party.  Lewis told investors they would profit from the transport and delivery of HOGT customers' oil to local refineries.  Lewis Oil Corp. also conducted additional offerings for Integrality,[8] as well as a prepay program offering[9] designed to attract more customers to the transportation company. Similar to AmeraTex investments, purchasers of these limited partnership interests had limited liability and had no power to take an active role in company operations.

48.     For the Integrality offering, Lewis and Lewis Oil Corp. not only contacted previous AmeraTex investors, but they conducted a nationwide cold-calling campaign aimed at targeting new investors.  The other Lewis Oil Corp. Offerings targeted existing investors or known contacts.  From at least March 2013 through May 2016, Lewis Oil Corp. paid commissions to at least five salespeople, who were supervised by Lewis.  Lewis also solicited

---

[8] For the additional Integrality offerings, Lewis issued letters soliciting additional funds from Integrality investors purportedly to use for LOTS operating and litigation costs.
[9] The prepay services program was designed to attract more customer accounts to LOTS by creating a fund to pay customers for their oil within 72 hours of pickup versus the payment cycle of 30-45 days apparently typical in the industry.

investors directly by acting as a Closer and paid himself commissions for sales of investments in the Lewis Oil Corp. Offerings.  From February 2013 through 2016, Lewis was active in the investor negotiation and closing process in each Lewis Oil Corp. offering and regularly communicated with investors about the benefits of their investment, likelihood of earning profits, and status of the project and their funds.

49.     Using the AmeraTex Offering Documents as a template, Lewis drafted, and Fort and Bull reviewed, the 2013 Integrality PPM and cover letter sent to Lewis Oil Corp. investors. Similarly, Lewis and Bull drafted, reviewed, and edited subsequent non-offering materials, such as Lewis Oil Corp. update letters and other investor communications sent via U.S. mail.  Lewis had final approval of all the Lewis Oil Corp. offering materials and investor communications.

50.     In Spring 2014, upon discovering that his brother and SWO&ISM had embezzled money from HOGT, Lewis acquired the remaining 2% ownership in HOGT from a third-party. Integrality took majority control of HOGT, ousted SWO&ISM, and Lewis renamed the company Lewis Oil Transportation Services ("LOTS").  This acquisition started a series of legal battles for Lewis and his entities.  To pay for litigation costs and to recoup purportedly embezzled funds, Lewis conducted additional offerings for Integrality and conducted an offering for a "Prepay Services Program," designed to attract more customers to LOTS.  However, LOTS never made a profit, shut down in August 2016, and sold off most of its assets by Summer 2017.

51.     Fox kept the accounting books and records for Integrality, but again employed improper accounting practices, keeping sizeable expenses off the books and mischaracterizing commission payments and payments to his entity, Consolidated Energy.  Fox also prepared the K-1 statements for Integrality investors.  For at least the 2016 K-1 statements, Fox relied solely on the oral representations of Lewis regarding the depreciated value of certain assets.  As a

result, Fox provided Integrality investors information about LOTS assets without a reasonable basis to support the accuracy of that information.

52.     In 2015 and 2016, Lewis, acting on behalf of Lewis Oil Corp., conducted two additional offerings.  One venture sought a single $50,000 investment from an investor from Illinois (the "Illinois Investor") for the purpose of reworking a single well.  The second was an offering of limited partnership interests in "NRG Oil," which raised approximately $250,000 from eight investors for the purpose of reworking five wells.

53.     The additional offerings for Integrality and the Prepay program, NRG Oil offering, and Illinois Investor offering—which raised a total of $2.3 million—were conducted almost solely by Lewis and he alone was responsible for the offering materials and investor correspondence.

54.     In the operation of Lewis Oil Corp., Lewis continued the same dishonest business practices he employed in the AmeraTex partnerships.  If anything, Lewis's deceptions increased as a result of the lawsuits with SWO&ISM and others and his descent into deeper financial trouble because of personal vices.  While Lewis Oil Corp. raised $8.8 million as a result of Lewis's misrepresentations and omissions, investors made little to no return on their investment, and Lewis personally received ill-gotten gains of at least $1 million.

**D.    DEFENDANTS LEWIS OIL CORP. AND LEWIS MADE MATERIAL MISREPRESENTATIONS AND OMISSIONS IN CONNECTION WITH THE OFFER, PURCHASE, AND SALE OF LEWIS OIL CORP. SECURITIES.**

55.     The Integrality offering materials drafted by Lewis and reviewed by Bull contained a summary letter and a PPM.  Additional offerings for Integrality and the pre-pay program consisted of brief offering letters.  Lewis solely authored and distributed offering documents: (a) provided to the Illinois Investor, and (b) used for the NRG offering.  These

materials provided to investors contained materially false and misleading statements and omissions.

### 1.   Misrepresentations Regarding the Transportation Company and Omission of Related Party Involvement.

56.     In February 2013, Lewis described HOGT in Integrality offering materials as a currently operating transportation company.  Prospective investors were told in the offering cover letter in bold, italicized font that: **"Currently, H[O]GT has 90 customer accounts and delivers approximately 20,000 barrels of oil per month to market."**  This was false for numerous reasons: (1) HOGT was not an operating transportation company in February 2013; (2) HOGT had not yet acquired Coomer Transportation's assets; and (3) HOGT would not begin transporting any oil until October 2013.  Further, according to the HOGT/LOTS manager, the company never had more than 50 accounts and never transported more than 4,000 barrels per month.  Lewis's offering documents further described this non-operational company as "not a pipe dream but a reality" and with "no changes at all" to the current status of the company, investors "can realize a 30-35% APR on [y]our investment."

57.     The Integrality offering materials also omitted the role of SWO&ISM – the other 49% interest owner in HOGT.  SWO&ISM was co-managed and operated by Tom Lewis's brother, David Lewis.  Integrality investors did not know of David Lewis's involvement, that he had been convicted in 2000 of securities fraud, or that he had been indicted on similar charges again in June 2012.[10]

### 2.   Misrepresentations Regarding the Use of Investor Proceeds.

58.     The Integrality PPM included a use-of-proceeds chart that contained numerous untrue statements.  First, the chart showed that 45% of investor funds ($2.75 million) were going

---

[10] David Lewis was again convicted in September 2013, and sentenced to 30 years in prison.

to be used as "final payment" for the "purchase of Coomer Transportation, the equipment, accounts, [and] real properties." In reality, the entire purchase price for the Coomer Transportation transaction was $2.75 million, and it excluded customer accounts and Coomer's oil wells. Thus, the $2.75 million included in the use-of-proceeds chart represented the entire payment, not the final payment. The chart also allocated 11.65% ($700,000) for costs associated with storage and staging facilities. The corresponding footnote in the PPM represented that four of six staging facilities had already been purchased. In reality, however, no staging facilities ever existed.

59.    Similar to the AmeraTex PPMs, the Integrality PPM explicitly stated "[n]o commissions will be paid to officers, directors and employees of the Managing General Partner [Lewis Oil Corp.] engaged in the sale of Units." This was false. Commissions were paid to at least five salespeople through the same entities or DBAs that Fort and Lewis required each salesperson to set up for AmeraTex. The Integrality PPM also falsely guaranteed no loans or advances would be made by the partnership to Lewis Oil Corp. or any of its affiliates; in reality, partnership funds were loaned and comingled with Lewis Oil Corp. funds and distributed to entities unrelated to Integrality.

### 3.    Misrepresentations Regarding LOTS Litigation in Additional Integrality Offerings.

60.    When Integrality took majority control of HOGT in Spring 2014, Lewis and his entities became embroiled in a series of lawsuits. Lewis sold additional limited partnership interests in Integrality and the prepay program throughout 2015 and 2016 to purportedly "sustain the Company" and to pay for the legal costs. In the various offering materials and investor correspondence authored by Lewis, he misrepresented the status of the litigation with SWO&ISM and the business opportunities available to LOTS.

61. First, in offering letters distributed in July 2015, Lewis represented that he personally contributed $400,000 to fund LOTS's operations and to pay its attorneys' fees. However, at most, Lewis contributed $48,000 in personal funds to LOTS's operations and $10,000 for its attorneys' fees.

62. Second, in October 2016 (two months after LOTS ceased operating), Lewis sought additional funds for LOTS's operations. In these offering letters, Lewis claimed that LOTS would be awarded summary judgment and a $1 million recovery in a lawsuit against SWO&ISM. Lewis, however, conflated the status of two different lawsuits. In a federal court lawsuit, LOTS was a <u>Defendant</u> and a summary judgment motion filed *against it* by the Plaintiffs (SWO investors) was pending. SWO&ISM had already settled the lawsuit and had been dismissed as defendants. In a Kentucky state court proceeding, LOTS had sued SWO&ISM, but that case had been inactive since March 2015, while the parties waited on a ruling from the court on SWO&ISM's motion to dismiss. Therefore, Lewis had no reasonable basis to assert that LOTS would be awarded a $1 million recovery or that it would obtain summary judgment.

### 4. False Representations Regarding Well Ownership and Collateral Guaranteed to the Illinois Investor.

63. In May 2015, Lewis convinced the elderly Illinois Investor to buy a 12.5% working interest in the "R-1 well" for $50,000. The Illinois Investor took out a home equity loan to make the investment. Lewis claimed that he planned to rework this well, located on the Spears lease in Monroe County, Kentucky. In the investment contract, Lewis agreed to collateralize the investment with a lien on other property that Lewis claimed to personally own. None of these representations were true.

64. First, there was no R-1 well located on the Spears lease, so no working interest could have been sold to the Illinois Investor. Second, Lewis never executed the promised lien

agreement and, in fact, sold the claimed collateral three months after the investment. Finally, instead of reworking the well, Lewis spent almost all of the Illinois Investor's funds two weeks after receiving the investment, using: (a) $30,000 to cover AmeraTex overhead expenses, and (b) $18,000 on personal spending, including a $5,000 alimony check to his ex-wife.

### 5. False Financial Statements and False Reserve Estimates Provided to NRG Investors.

65.     In 2016, Lewis raised $250,000 from investors for a limited partnership called "NRG Oil" for the purpose of reworking five wells located on the Noel Singer lease in Cumberland County, Kentucky. While investors were conducting their due diligence on this investment opportunity in the Fall of 2015, Lewis emailed them financial statements for Lewis Oil Corp., LOTS, and StrataTech Services ("StrataTech") (the proposed Operator) in December 2015. However, the financial statements Lewis sent to investors were completely fabricated.

66.     Lewis also represented to NRG investors in an October 21, 2015 email that the Noel Singer lease reserves "hold over 2 million barrels of oil in place currently." Lewis further stated "[w]e chose this lease and these selected wells, because of the reserves . . . confirmed . . . through our Geologist Dr. Rob Miles." In reality, Lewis inflated this number by a factor of ten. Dr. Miles's reserve report for the Noel Singer lease reflected total net reserves of only 204,000 barrels.[11]

67.     Lewis repeatedly made false statements in offering materials provided to, and in communications with, NRG investors. When answering their due diligence questions, Lewis lied about: (a) having ownership in StrataTech (he had none); (b) not being involved in any litigation (he or his entities were named in at least two pending lawsuits); (c) not having unpaid taxes (taxes were delinquent or never filed on all Lewis-controlled entities and HOGT had

---

[11] Lewis described the reserves of the Singer lease in an email to a different prospective investor as "we are sitting on 40 million barrels of oil reserves completely verified and preformed [sic] by ou[r] Geologist and Engineer . . . ."

received payment demands from the IRS); and (d) the size of his companies (he inflated the number of employees his companies had by roughly 50%).

## E.    LEWIS OIL CO. OFFERING

68.    In 2015, Lewis formed Lewis Oil Co. to distance himself from the financial troubles of his other companies.  Lewis Oil Co. only conducted one offering, had one investor, and maintained no books and records.  In Spring 2016, Lewis solicited a small bible college in Kentucky to make a $100,000 investment in a "prepay services" program associated with LOTS. Lewis represented that the bible college would be paid a return from the prepay profits earned by the transport company.  The offering documents consisted of a brochure and investment contract. The brochure stated the investment would be managed by Lewis Oil Co. and LOTS – two entities ultimately controlled by Lewis.  As detailed below, Lewis made numerous misrepresentations in connection with this offering and personally received ill-gotten gains of at least $33,000.

## F.    DEFENDANTS LEWIS OIL CO. AND LEWIS MADE MATERIAL MISREPRESENTATIONS AND OMISSIONS IN CONNECTION WITH THE OFFER, PURCHASE, AND SALE OF LEWIS OIL CO. SECURITIES.

69.    Lewis drafted the Lewis Oil Co. offering documents and executed the investment contract with the bible college.  Lewis also communicated directly with the bible college's investment representative.  Lewis made materially false and misleading statements, and omitted material information, in the Lewis Oil Co. offering documents and in his direct communications with the bible college's representative.

### 1.    False Guarantees Regarding Use of Funds

70.    The Lewis Oil Co. investment documents specifically stated that "[Lewis Oil Co.] shall only utilize the [prepay] funds . . . to pay for crude oil purchased by LOTS in the regular

course of business and for no other purpose and shall not commingle any [] funds . . . ."  In reality, no funds were used to prepay LOTS customers.  And within one month of receipt of the bible college's investment, Lewis misappropriated $33,000 of its funds through checks to himself or via cash withdrawals.

### 2.     Falsified Balance Sheet

71.     Prior to the bible college's investment, Lewis provided its representative with a purported "balance sheet" for the LOTS "Prepay Services Account."  However, Lewis actually provided the bible college representative with an Excel spreadsheet showing only certain bank account entries with an added column of descriptions for only *some* of the debit entries.  And these bank account entries were from the LOTS *Operating Account*, not the Prepay Services Account.  Further, Lewis included misleading descriptions of the entries to conceal his personal spending.  For example, Lewis falsely characterized checks for $7,550 and $2,500 as payments to HOGT/LOTS, when he actually wrote them to "Cash" and cashed them himself.  Similarly, he completely removed an entry listing a $987 check he wrote to First & Farmers National Bank as a payment he owed on a personal loan.

### G.     DEFENDANTS AMERATEX, LEWIS OIL CORP., LEWIS OIL CO., LEWIS, FORT, AND FOX MISAPPROPRIATED INVESTOR FUNDS.

72.     AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, and Fox misused and misappropriated investor funds.  For at least the AmeraTex Cumberland Development and Kettle Creek Development offerings, the wells were never even drilled and leases never obtained; instead, most investor funds were spent to enrich Lewis and his team.  For Lewis Oil Corp. Offerings, LOTS's operations were short-lived and unprofitable, and LOTS customers were never prepaid.  The bulk of funds raised by Integrality and additional offerings were used to enrich Lewis or were transferred for use by other entities and unrelated partnerships.  The Illinois

Investor's well never existed, so it was never reworked. Similarly, the NRG wells were not reworked and were eventually shutdown. Finally, the Lewis Oil Co. offering funds were misused by Lewis for his personal expenses and for unrelated expenses and partnerships.

73.     Lewis personally misappropriated at least $1.3 million of investor funds in addition to receiving a weekly salary of $2,500. Lewis spent this $1.3 million via cash withdrawals and via debit cards linked to nearly all accounts, which he used on lavish personal expenditures, including jewelry, retail spending, dining and entertainment, and strip club visits. Lewis also withdrew large amounts of cash from investor funds, wrote alimony checks to his ex-wife, and paid his personal credit cards and other personal bills. Lewis also engaged in a "check-cashing practice" where he sporadically wrote checks to at least three employees in amounts up to $3,500, but required the employees to cash them and bring him back the cash, which he pocketed for personal use. Lewis also wrote large checks to Fox's entity, DNDS, and then directed Fox to re-route the funds to Lewis for his personal use[12] or to be comingled with various unrelated partnerships.

74.     Fort also had a debit card that he used for dining and entertainment, jewelry, clothing, and electronics. Fort took payments directly from investors' partnership accounts and he also withdrew cash from investor accounts to pay for personal bills and expenses. Fort misappropriated at least $70,000 of investor funds, in addition to his salary and commission payments. Fort also knew that Lewis was misappropriating funds for personal use.

75.     Fox also took payments directly from investors' partnership accounts and siphoned money through Consolidated. Fort helped Fox, signing some of the checks that sent investor monies to Consolidated. Fox misappropriated at least $118,000 of investor funds, in

---

[12] For instance in December 2013, Lewis wrote a $75,000 check from Lewis Oil to DNDS and then directed Fox to wire $25,000 on behalf of Lewis to a technology company for Lewis's personal investment.

addition to his salary and bonuses.  Fox also concealed the misappropriation and misuse of funds as detailed above.

**H.    DEFENDANTS CARRIED OUT A SCHEME TO DEFRAUD INVESTORS.**

76.    Defendants AmeraTex, Lewis, Fort, and Fox were all substantial participants in the scheme to defraud AmeraTex investors.  Lewis Oil Corp., Lewis, and Fox participated in the scheme to defraud Lewis Oil Corp. investors.  Lewis was the only individual involved in the Lewis Oil Co. scheme.

77.    Defendants engaged in a practice and course of conduct of misappropriating investor funds, comingling and loaning investor funds to unrelated entities, using investor money to pay personal expenses, creating and distributing false financial documents including investor K-1 statements, and concealing such acts.

78.    For instance, Lewis and Fox had a practice of siphoning investor funds from AmeraTex and Lewis Oil Corp. to their personally-controlled Consolidated account.  It was Fox's practice to misleadingly characterize these payments as overhead or lease operating expenses in the accounting records of the partnerships.  Lewis and Fort also authorized the payments of 10% commissions to salespeople, which Fox then concealed by characterizing them as consulting fees.  Lewis and Fort tried to conceal the nature of the payments by requiring the commissions to be paid to entities created by the salespeople, not via normal payroll.

79.    Fox also engaged in a course of conduct that mischaracterized undisclosed personal spending in the accounting records of the partnerships, thereby concealing the true financial state of the MGPs and the partnerships for AmeraTex and Lewis Oil Corp.  Fox did not account for handwritten checks (at least 50% of all checks were handwritten), did not account for the personal spending by Lewis and Fort, and did not reconcile bank records with general

ledgers.  Fox also knew of Lewis's check-cashing practice with certain employees yet improperly booked these payments as compensation to the employees, rather than to Lewis.

80.     Fox knew that the AmeraTex PPMs dictated that AmeraTex, as the partnerships' MGP, would receive no more than roughly 30% of investor funds.  Yet with each partnership, Fox knowingly transferred funds to AmeraTex and other entities at Lewis's direction that were well beyond those percentages.  Fox acted similarly with regard to Integrality and Lewis Oil Corp. funds.  As a result, the books and records for AmeraTex and Lewis Oil Corp., and the tax returns and K-1 statements prepared by Fox and distributed to investors, were false, unreliable, and concealed the fact that many entities were losing money.

81.     Lewis and Fort also acted to conceal complaints from investors and employees and to prolong their fraudulent scheme.  From October 2012 through July 2014, Lewis and Fort took affirmative action to minimize the effect of the increasing number of public complaints appearing on the internet, by paying for Internet search suppression services.  Lewis and Fort also engaged in a practice of accepting and signing off on unaccredited and unqualified investors for the AmeraTex Offerings.  These fraudulent practices and patterns of conduct reveal that Lewis, Fort, and Fox, acting through AmeraTex, Lewis Oil Corp., or Lewis Oil Co., were engaged in a scheme to defraud investors.

82.     To persuade investors to invest in their offerings, Lewis, Fort, and Fox also engaged in a practice and course of business that consisted of making the untrue statements and omissions of material facts alleged above, including, among other things, the use of investor funds, the comingling or loaning of investor funds, the payment of commissions, the location and data of wells, the anticipated well production and returns to investors, and the financial health of the partnerships.  Bull reviewed and edited many of the false statements made to investors.

Moreover, Lewis and Fort did not act as represented in AmeraTex Offering Documents because for at least the Cumberland Development, Kettle Creek Development, and Parrish Sands partnerships they did not complete the drilling, well-completion, reworking, or production that they represented they would and, instead, diverted investors' funds for other undisclosed and unauthorized uses.  Additionally, Lewis and Lewis Oil Corp. did not complete the reworking represented in the investment contracts to the Illinois Investor and NRG investors. Taken together, Defendants' misrepresentations, omissions, and course of conduct resulted in misappropriation and misuse of investor funds.

**V.**
**CLAIMS FOR RELIEF**

**FIRST CLAIM**
**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

**(against AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, Fox, and Bull)**

83.     The Commission repeats and re-alleges Paragraphs 1 through 82 of the Complaint as if fully set forth herein.

84.     By engaging in the conduct described herein, AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, and Fox, directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, knowingly or with severe recklessness, employed devices, schemes, or artifices to defraud.

85.     By engaging in the conduct described herein, AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, Fox, and Bull, directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, and at least negligently, obtained money or property by means of untrue statements of material fact

or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

86.    By engaging in the conduct described herein, AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, and Fox, directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, and at least negligently, engaged in transactions, practices, and/or courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

87.    By engaging in this conduct, AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, and Fox violated, and unless enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), 77q(a)(3)].

88.    By engaging in this conduct, Bull violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

89.    Alternatively, by engaging in this conduct, Fox knowingly or with severe recklessness aided and abetted, pursuant to Section 20(e) of the Exchange Act, the violations by AmeraTex, Lewis Oil Corp., Lewis, and Fort under this Claim.

90.    By engaging in this conduct, Fox aided and abetted, and unless enjoined will continue to aid-and-abet, violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM
**Violations of Section 10(b) [15 U.S.C. § 78j(b)]**
**and Rule 10b-5 [17 C.F.R. § 240.10b-5]**

**(against AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, and Fox)**

91.    The Commission repeats and re-alleges Paragraphs 1 through 82 of the Complaint as if fully set forth herein.

92.     By engaging in the conduct described herein, Defendants AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, and Fox directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

91.     Defendants AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, and Fox engaged in this conduct intentionally, knowingly, or with severe recklessness.

93.     By engaging in this conduct, Defendants AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, and Fox violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rules 10b-5(a), 10b-5(b), and 10b-5(c) [17 C.F.R. §§ 240.10b-5].

94.     Alternatively, by engaging in this conduct, Fox knowingly or with severe recklessness aided and abetted, pursuant to Section 20(e) of the Exchange Act, the violations of AmeraTex,  Lewis Oil Corp., Lewis, and Fort under this Claim.

95.     By engaging in this conduct, Fox aided and abetted, and unless enjoined will continue to aid-and-abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

**THIRD CLAIM**
**Violations of Sections 5(a) and (c) of the Securities Act**
**[15 U.S.C. §§ 77e(a) & (c)]**

**(against AmeraTex, Lewis, and Fort, aiding and abetting by Bull)**

96.     The Commission repeats and re-alleges Paragraphs 1 through 82 of the Complaint as if fully set forth herein.

97.     By engaging in the conduct described herein, AmeraTex, Lewis, and Fort, directly or indirectly, singly or in concert with others, (i) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of written contracts, offering documents, prospectus, oral and written statements, or otherwise, securities as to which no registration statement was in effect; and/or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of written contracts, offering documents, prospectus, oral and written statements, or otherwise, securities as to which no registration statement had been filed.

98.     By engaging in this conduct, AmeraTex, Lewis, and Fort have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

99.     By engaging in the conduct described herein, Bull knowingly or with severe recklessness aided and abetted, pursuant to Section 20(e) of the Exchange Act, the violations of AmeraTex, Lewis, and Fort under this Claim.

100.     By engaging in this conduct, Bull aided and abetted, and unless enjoined will continue to aid-and-abet, violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## FOURTH CLAIM
### Violations of the Section 15(a) of the Exchange Act
### [15 U.S.C. § 78o(a)]

### (against Lewis and Fort)

101.    The Commission repeats and re-alleges Paragraphs 1 through 82 of the Complaint as if fully set forth herein.

102.    By engaging in the conduct described herein, Lewis and Fort, while engaged in the business of effecting transactions in securities for the account(s) of others, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered with the Commission as a broker or dealer or as an associated person of a registered broker or dealer, in accordance with Section 15(a) of the Exchange Act.

103.    By engaging in this conduct, Lewis and Fort have violated, and unless enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## VI.    RELIEF REQUESTED

For these reasons, the Commission respectfully requests the Court enter final judgments:

(a)    Permanently enjoining Defendants AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, Fox, and Bull from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

(b)    Permanently enjoining Defendants AmeraTex, Lewis Oil Corp., Lewis Oil Co., Lewis, Fort, and Fox from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

(c)    Permanently enjoining Defendants AmeraTex, Lewis, and Fort from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

(d)     Permanently enjoining Defendants Lewis and Fort from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

(e)     Permanently enjoining Defendants Lewis and Fort from directly or indirectly, including, but not limited to, through any entity they own or control, participating in the issuance, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant Fort or Defendant Lewis from purchasing or selling securities for their own personal accounts;

(f)     Permanently enjoining Defendant Fox from directly or indirectly, including, but not limited to, through any entity he owns or controls, providing bookkeeping services, preparing financial statements, and preparing tax returns and K-1 statements for any oil and gas entities;

(g)     Ordering Defendants AmeraTex, Lewis Oil Corp., Lewis Oil Co., and Lewis to disgorge, jointly and severally, all ill-gotten gains, benefits, and/or unjust enrichment realized by each of them, plus prejudgment interest on that amount;

(h)     Ordering Defendants Fort, Fox, and Bull to disgorge all ill-gotten gains, benefits obtained, and/or unjust enrichment realized by each of them, plus prejudgment interest on those amounts;

(i)     Ordering each Defendant to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(j)     Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

(k)     Granting all other relief to which the Commission may be entitled.

Dated: February 27, 2018

Respectfully submitted,

_____

MATTHEW J. GULDE
Illinois Bar No. 6272325
SARAH S. MALLETT
Texas Bar No. 24078907
JAMES E. ETRI
Texas Bar No. 24002061
United States Securities and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
Ph: 817-978-1410
Fax: 917-978-4927
guldem@sec.gov


ATTORNEYS FOR PLAINTIFF UNITED
STATES SECURITIES AND EXCHANGE
COMMISSION