# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § § *Plaintiff*, § § v. § § AMERATEX ENERGY, INC., LEWIS OIL § CORPORATION, LEWIS OIL COMPANY, § THOMAS A. LEWIS, WILLIAM R. FORT, § DAMON L. FOX, and BRIAN W. BULL, § § *Defendants*. § | Civil Action No.  4:18-CV-00129 Judge Mazzant |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the Securities and Exchange Commission's ("SEC") Motion for Remedies and for Entry of Final Judgement (Dkt. #75). Having considered the motion and the relevant pleadings, the Court finds that the motion should be granted.

### BACKGROUND

Thomas A. Lewis ("Lewis") owned and controlled AmeraTex Energy, Inc. ("AmeraTex"), Lewis Oil Corp., and Lewis Oil Co. Between February 2013 and summer 2016, these companies raised approximately $11.7 million from more than 150 investors in approximately thirty-six states primarily by selling interests in limited partnership oil drilling and operations programs in Kentucky.

Lewis owned and served as CEO for AmeraTex. William R. Fort ("Fort") served as Vice President of AmeraTex from November 2008 to July 2013, and then served as President in 2013 through 2014. Fort aided Lewis in making materially misleading statements and omissions in soliciting investors. Damon L. Fox ("Fox") served as the accountant for AmeraTex and Lewis Oil

Corp from fall 2009 to spring 2017. Fox diverted investor funds for his and Lewis's personal use and prepared false tax forms to perpetuate the fraud. Brian W. Bull ("Bull") served as Compliance Coordinator for AmeraTex and Lewis Oil Corp. from April 2011 to July 2017. Bull reviewed and revised many of the misstatements to investors, enabled the solicitation and acceptance of unqualified investors, and filed false forms with the SEC. By engaging in the conduct described above, Defendants violated several provisions of the federal securities laws.

On February 27, 2018, the SEC filed this action (Dkt. #1). On June 18, 2018, the Court entered an order adopting the Report and Recommendation of the Magistrate Judge on the Parties Unopposed Motion to Enter Agreed Partial Judgment Against Defendants (Dkt. #26). As part of the agreed judgment, (1) Lewis, Fort, Bull, and the entity defendants have agreed that the Court shall order disgorgement, prejudgment interest, and civil penalty against them, and that the Court shall determine the appropriate amount (Dkt. #22; Dkt. #27; Dkt. #28; Dkt. #31; Dkt. #48); (2) for the purposes of the SEC's remedies motion, each defendant has agreed to accept the allegations of the Complaint as true[1]; (3) AmeraTex and the Lewis Oil entities agreed to the Court's entry of judgments that permanently enjoined them from violating Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder[2]; (4) AmeraTex further agreed to be permanently enjoined from violating Sections 5(a) and 5(c) of the Securities Act; (5) Lewis and Fort agreed to the Court's entry of judgments permanently enjoining them from violating Sections 5(a), 5(c), and 17(a) of the Securities Act and Sections 10(b) and 15(a) of the Exchange Act and Rule 10b-5 thereunder; (6) Lewis and Fort further agreed to a preliminary injunction barring them from participating in

---

[1] Lewis: (Dkt. #22-6, p. 6 at Sect. VI) (incorporated by Order) (Dkt. #27); Fort: (Dkt. #28-2, p. 7 at Sect. VI) (incorporated by Order) (Dkt. #31); Fox: (Dkt. #46, pp. 3-4 at Sect. IV); Bull: (Dkt. #48, p. 3 at Sect. III).
[2] The SEC has declined to seek disgorgement or civil penalties against the entities because the entities are defunct and without operations or assets.

the issuance, offer, or sale of any security, with the Court to determine on motion of the SEC whether this injunction should be made permanent or otherwise modified[3]; (7) Fox agreed to the Court's entry of a judgment that permanently enjoined him from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (8) Fox further agreed that the Court will determine, upon motion of the SEC, whether he should be enjoined from providing bookkeeping services, preparing financial statements, and preparing tax returns and K-1 statements for any oil and gas entities; and (9) Bull agreed to the Court's entry of a judgment that permanently enjoined him from violating Sections 5(a), 5(c), and 17(a)(2) of the Securities Act (Dkt. #75 at p. 7–9).

On February 26, 2021, the SEC filed its Motion for Remedies and for Entry of Final Judgement (Dkt. #75). A response to the Motion was due on March 12, 2021. *See* LOCAL RULE C–7(e).[4] As of the date of this Memorandum Opinion and Order, Defendants have not filed a response to the SEC's motion.

## ANALYSIS

As explained above, Defendants entered into settlement agreements with the SEC. Pursuant to such agreements, several issues remain undecided for a later determination to be made by the Court. Specifically, for Lewis, Fort, and Bull, the Court is to determine the amount of disgorgement, prejudgment interest, and civil penalties against them. For Fox, the Court will determine *whether* disgorgement, prejudgment interest, and civil penalty are appropriate as to him, and if so, how much. Additionally, the Court must decide whether Lewis and Fort should be permanently enjoined from directly or indirectly participating in the issuance, offer, or sale of any

---

[3] Lewis, Fort, and the SEC agree that any such injunction would not prevent Lewis and Fort from purchasing or selling securities for their own personal accounts.
[4] Local Rule CV-7(e) provides a party opposing a motion fourteen days to file a response and any supporting documents.

security, provided, however, that such injunction will not prevent them from purchasing or selling securities for their own personal accounts. And finally, the Court must determine if Fox should be permanently enjoined from providing bookkeeping services, preparing financial statements, and preparing tax returns and K-1 statements for oil and gas entities. The Court will address each individual in turn.

### I. Lewis

#### a. Disgorgement

"The district court has broad discretion not only in determining whether to order disgorgement but also in calculating the amount to be disgorged." *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993). The purpose of disgorgement "is to deprive the party or parties responsible for the fraud of their gains and to deter future violations of the law." *SEC v. Helms*, No. A-13-CV-01306, 2015 WL 5010298, at *19 (W.D. Tex. Aug. 21, 2015) (citing *SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir. 1993)). In actions brought by the SEC involving a securities violation, "disgorgement need only be a reasonable approximation of profits causally connected to the violation." *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007) (quoting *SEC v. First City Fin. Corp.*, 890 F.3d 1215, 1231 (D.C. Cir. 1989)). As such, the proper starting point for disgorgement is the total proceeds received from the sale of the securities. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972).

The SEC bears the initial burden of showing that its requested disgorgement amount reasonably approximates the amount of profits connected to the violation. *First City*, 890 F.2d at 1232; *SEC v. Rockwall Energy of Tex., LLC*, No. H-09-4080, 2012 WL 360191, at *3 (S.D. Tex. Feb. 1, 2012). Once the SEC meets its burden, the burden shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *First City*, 890 F.2d at 1232. In

attempting to mitigate their liability, securities laws violators may not offset such liability with business expenses. *SEC v. United Energy Partners, Inc.*, 88 Fed. App'x 744, 746 (5th Cir. 2004) (citing cases); *see also SEC v. Kahlon*, No. 4:12-CV-517, 2016 WL 5661642, at *4 (E.D. Tex. Sept. 30, 2016). Courts are likely to order joint and several liability against defendants as to disgorgement when "two or more individuals or entities collaborate or have close relationships in engaging in the illegal conduct." *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d. Cir. 1997); *see also SEC v. First Jersey*, 101 F.3d 1450, 1475 (2d Cir. 1996).

The SEC argues for a disgorgement of $1,840,669.73, representing profits gained because of Lewis's conduct alleged in the Complaint. To support its request, the SEC attached the declaration of Sarah Mallett ("Mallett"), the SEC's lead investigative attorney in the investigation that led to the filing of the above-referenced lawsuit (Dkt. #75, Exhibit 1).

In her declaration, Mallett explained that she (1) collected and reviewed many documents, including business documents produced by the defendants related to the oil-and-gas offerings that are the subject of this lawsuit, such as private placement memoranda, subscription agreements, investor records, and bank records; (2) took investigative testimony from each of the individual defendants in this case; (3) obtained and reviewed financial records and bank records related to the AmeraTex Energy, Inc., Lewis Oil Corporation, and Lewis Oil Company and all of their subsidiary entities; and (4) learned that Lewis and Fox created a shell entity in 2010 called Consolidated Energy, Ltd., ("Consolidated Energy") that they used to transfer more than $390,000 of investor funds from AmeraTex Energy and Lewis Oil Corporation partnership accounts throughout 2013 and 2014 (Dkt. #75, Exhibit 1 ¶¶ 3–6).

After analysis of all the accounts for the period starting February 27, 2013, (five years before the filing of the complaint), Mallett concluded that Lewis personally received a total of

5

$1,840,669.73 in the form of personal checks, cash payments and withdrawals, debit card transactions at exotic dance clubs, and for other personal expenses (Dkt. #75, Exhibit 1 ¶ 7). Because Defendants failed to file a response contesting the Motion, the Court finds that $1,840,669.73 is an appropriate amount for disgorgement.

### b. Prejudgment Interest

A court may award prejudgment interest in order to prevent a defendant from profiting from his securities violations by what amounts to an interest free loan procured by illegal activity. *SEC v. Gunn*, No. 3:08-CV-1013-G, 2010 WL 3359465, at *2 (N.D. Tex. Aug. 25, 2010) (citing *SEC v. Sargent*, 329 F.3d 34, 40–41 (1st Cir. 2003)). Such an award "rests within the equitable discretion of the district court to be exercised according to consideration of fairness." *Helms*, 2015 WL 5010298, at *19 (citations omitted). "In calculating this sum, the [C]ourt generally turns to the Internal Revenue Service's underpayment rate related to income tax arrearages." *Id.* (citing 26 U.S.C. § 6621(a)(2); *SEC v. Koenig*, 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007)). Similar to disgorgement, a court is likely to order joint and several liability against defendants as to prejudgment interest on disgorgement when the defendants "collaborate or have close relationships in engaging in the illegal conduct." *Hughes Capital Corp.*, 124 F.3d at 455; *First Jersey*, 101 F.3d at 1475.

The SEC request prejudgment interest in the amount of $106,525.57. To support this amount, the SEC has attached a copy of Lewis's Prejudgment Interest Report (Dkt. #75, Exhibit 7). The SEC arrived to this amount by taking the tax underpayment rate from October 2016, (the last month in which Lewis and his entities raised investor funds for the projects) through April 25, 2018, (the date on which Lewis executed his consent to settlement) and applying the rate to the principal of $1,840,669.73.

Because the Court awarded the SEC disgorgement of Lewis's ill-gotten gains, prejudgment interest is appropriate. *See Helms*, 2015 WL 5010298, at *20. Based on the evidence presented by the SEC and Defendants lack of a response contesting the evidence, the Court awards the requested amount of $106,525.57 for prejudgment interest against Lewis.

### c. Civil Penalty

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the Court to assess civil penalties. 15 U.S.C. §§ 77t(d), 78u(d). Such penalties "are designed to serve as deterrents against securities law violations, in contrast with disgorgement, which primarily aims to remove a defendant's profit from illegal transactions and which 'merely places the offender in the same position he would have been had he not committed the offense.'" *Helms*, 2015 WL 5010298, at *21 (quoting *SEC v. Lipson*, 129 F. Supp. 2d 1148, 1159 (N.D. Ill. 2001)). There are three tiers of penalties, each with a required showing. All violations are subject to first-tier sanctions. *See* 15 U.S.C. §§ 77t(d), 78u(d). Second-tier sanctions are warranted when violations involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." Id. Third-tier sanctions are appropriate for violations that involve fraud and "result[] in substantial losses to other persons." Id. The maximum penalty the Court may award is the greater of the gross amount of pecuniary gain or the amount set by statute, i.e., set by the applicable tier. *SEC v. Fox*, 4:17-CV-271, 2018 WL 1210858, at *3 (E.D. Tex. Mar. 8, 2018).

Although the maximum penalty is determined by statute, the amount imposed is left to the Court's discretion. *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005). In determining the appropriate civil penalty, the Court considers the following factors:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the

7

penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Helms*, 2015 WL 5010298, at *21 (quoting *SEC v. Offill*, No. 3:07-CV-1643-D, 2012 WL 1138622, at *3 (N.D. Tex. Apr. 5, 2012)).

The SEC requests the Court to order third-tier penalties against all individual defendants in this case. For Lewis, the SEC asks the Court to order a one-time, third-tier civil penalty commensurate with the amount of Lewis's pecuniary gain: $1,840,669.73. Here, Lewis acted egregiously and participated in activities that involved fraud, deceit, and manipulation on a large scale in clear disregard of federal security laws. Specifically, Lewis's complex, wide-ranging fraud scheme involved knowingly misleading investors to contribute large financial investments followed by Defendants comingling and misappropriating such funds. Moreover, Lewis's violations resulted in substantial losses to the investors of nearly $12 million.

Due to the impropriety of Lewis's actions, the Court finds it appropriate to impose a civil penalty on Lewis for the amount the SEC requested: $1,840,669.73.

### d. Permanent Injunction

Section 21(d) of the Exchange Act provides for injunctive relief when the evidence establishes a "reasonable likelihood" that a Defendant will engage in future violations of the securities laws. *See* 15 U.S.C. §§ 77t(b), 78u(d)(1); *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981); *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978). "[T]he Commission is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a 'reasonable likelihood' of future transgressions." *Zale Corp.*, 650 F.2d at 720; *SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1973). When predicting the likelihood of future violations, the Court evaluates the totality of the circumstances. *Zale Corp.*, 650 F.2d at 720. Further, in determining whether to

impose a permanent injunction, the Court considers several factors, including: (1) egregiousness of the defendant's conduct; (2) isolated or recurrent nature of the violation; (3) degree of scienter; (4) sincerity of the defendant's recognition of his transgression; and (5) likelihood of the defendant's job providing opportunities for future violations. *SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009); *Blatt*, 583 F.2d at 1334–35.

The SEC requests that the Court should "permanently enjoin Lewis . . . from the issuance, offer, or sale of any security." (Dkt. #75 at p. 20). As mentioned above, Lewis acted egregiously in conducting his fraudulent scheme. Lewis sold unregistered securities, knowingly misappropriated investor funds, and paid to conceal their fraud from Internet searches. Over the course of five years, Lewis fraudulently raised millions of dollars and harmed over 150 people in the process. When he needed to close a deal, Lewis would lie. When his returns did not look profitable, Lewis would cook the books. When his companies ran into financial difficulties, Lewis formed a new one. When investors complained, Lewis covered it up.  Such conduct clearly illustrates a pattern of securities violations as well as a high likelihood of future violations. Accordingly, a permanent injunction preventing Lewis from engaging in future securities offerings is warranted.[5] *See Helms*, 2015 WL 5010298, at *18; *SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355, 369 (D.R.I. 2011).

## II. Fort

### a. Disgorgement

The SEC argues for a disgorgement of $161,205.24, representing profits gained because of Fort's conduct alleged in the Complaint. To support its request, the SEC attached Mallett's declaration (Dkt. #75, Exhibit 1).

---

[5] Such injunction shall not prevent Lewis from purchasing or selling securities for his own personal accounts.

After analysis of all the accounts for the period starting February 27, 2013, (five years before the filing of the complaint), Mallett concluded that Fort personally received a total of $161,205.24, and this payment was remitted as regular salary, commissions, or bonuses (Dkt. #75, Exhibit 1 ¶ 7). Because Defendants failed to file a response contesting the Motion, the Court finds that $161,205.24 is an appropriate amount for disgorgement.

### b. Prejudgment Interest

The SEC request prejudgment interest in the amount of $22,409.80. To support this amount, the SEC has attached a copy of Fort's Prejudgment Interest Report (Dkt. #75, Exhibit 8). The SEC arrived to this amount by taking the tax underpayment rate from October 2014, (the last month in which Fort received investor funds) through June 26, 2018, (the date on which Fort executed his consent to settlement) and applying the rate to the principal of $161,205.24.

Because the Court awarded the SEC disgorgement of Fort's ill-gotten gains, prejudgment interest is appropriate. *See Helms*, 2015 WL 5010298, at *20. Based on the evidence presented by the SEC and Defendants lack of a response contesting the evidence, the Court awards the requested amount of $22,409.80 for prejudgment interest against Fort.

### c. Civil Penalty

For Fort, the SEC asks the Court to order a one-time, third-tier civil penalty commensurate with the amount of Fort's pecuniary gain: $161,205.24. Here, Fort acted egregiously and participated in activities that involved fraud, deceit, and manipulation on a large scale in clear disregard of federal security laws. Specifically, Fort's complex, wide-ranging fraud scheme involved knowingly misleading investors to contribute large financial investments followed by Defendants comingling and misappropriating such funds. Moreover, Fort's violations resulted in substantial losses to the investors of nearly $12 million.

Due to the impropriety of Fort's actions, the Court finds it appropriate to impose a civil penalty on Fort for the amount the SEC requested: $161,205.24.

### d. Permanent Injunction

The SEC requests that the Court should "permanently enjoin . . . Fort from the issuance, offer, or sale of any security." (Dkt. #75 at p. 20). As mentioned above, Fort acted egregiously in conducting his fraudulent scheme. Like Lewis, Fort sold unregistered securities and knowingly misappropriated investor funds. Over the course of five years, Fort fraudulently raised millions of dollars and harmed over 150 people in the process. Fort incessantly lied to investors to solicit more money. He would tell investors how great the wells were despite having never actually drilled the well. He would withdraw money from investor accounts to pay personal bills and expenses. And he even aided in covering up the negative reviews online. Such conduct clearly illustrates a pattern of securities violations as well as a high likelihood of future violations. Accordingly, a permanent injunction preventing Fort from engaging in future securities offerings is warranted.[6] *See Helms*, 2015 WL 5010298, at *18; *Locke Capital Mgmt., Inc.*, 794 F. Supp. at 369.

### III. Bull

#### a. Disgorgement

The SEC argues for a disgorgement of $205,009.57, representing profits gained because of Bull's conduct alleged in the Complaint. To support its request, the SEC attached Mallett's declaration (Dkt. #75, Exhibit 1).

After analysis of all the accounts for the period starting February 27, 2013, (five years before the filing of the complaint), Mallett concluded that Bull personally received a total of $205,009.57, and this payment was remitted as regular salary, commissions, or bonuses (Dkt. #75,

---

[6] Such injunction shall not prevent Fort from purchasing or selling securities for his own personal accounts.

Exhibit 1 ¶ 7). Because Defendants failed to file a response contesting the Motion, the Court finds that $205,009.57 is an appropriate amount for disgorgement.

### b. Prejudgment Interest

The SEC request prejudgment interest in the amount of $18,994.88. To support this amount, the SEC has attached a copy of Bull's Prejudgment Interest Report (Dkt. #75, Exhibit 9). The SEC arrived to this amount by taking the tax underpayment rate from July 2017, (the last month in which Bull received investor funds) through June 25, 2019, (the date on which Bull executed his consent to settlement) and applying the rate to the principal of $205,009.57.

Because the Court awarded the SEC disgorgement of Bull's ill-gotten gains, prejudgment interest is appropriate. *See Helms*, 2015 WL 5010298, at *20. Based on the evidence presented by the SEC and Defendants lack of a response contesting the evidence, the Court awards the requested amount of $18,994.88 for prejudgment interest against Bull.

### c. Civil Penalty

For Bull, the SEC asks the Court to order a one-time, third-tier civil penalty commensurate with the amount of Bull's pecuniary gain: $205,009.57. Here, Bull acted egregiously and participated in activities that involved fraud, deceit, and manipulation on a large scale in clear disregard of federal security laws. Specifically, Bull knowingly mislead investors to contribute large financial investments, he filed false forms with the SEC, and he oversaw sales teams who solicited and accepted non-accredited investors. Moreover, Bull's violations resulted in substantial losses to the investors of nearly $12 million.

Due to the impropriety of Bull's actions, the Court finds it appropriate to impose a civil penalty on Bull for the amount the SEC requested: $205,009.57.

### IV. Fox

#### a. Disgorgement

The SEC argues disgorgement is warranted against Fox and that the appropriate amount is $435,684.86, representing profits gained because of Fox's conduct alleged in the Complaint. To support its request, the SEC attached Mallett's declaration (Dkt. #75, Exhibit 1).

After analysis of all the accounts for the period starting February 27, 2013, (five years before the filing of the complaint), Mallett concluded that Fox received a total of $435,684.86 (Dkt. #75, Exhibit 1 ¶ 7). Fox received $347,112.36 for accounting services provided by him and his firm—DNDS Consulting—and $88,572.50 by virtue of his personal spending and misappropriation of funds from the Consolidated Energy account. (Dkt. #75, Exhibit 1 ¶ 7). Because Defendants failed to file a response contesting the Motion, the Court finds that $435,684.86 is an appropriate amount for disgorgement.

#### b. Prejudgment Interest

The SEC request prejudgment interest in the amount of $38,787.04. To support this amount, the SEC has attached a copy of Fox's Prejudgment Interest Report (Dkt. #75, Exhibit 10). The SEC arrived to this amount by taking the tax underpayment rate from May 2017, (the last month in which Fox received investor funds) through April 10, 2019, (the date on which Fox executed his consent to settlement) and applying the rate to the principal of $435,684.86.

Because the Court awarded the SEC disgorgement of Fox's ill-gotten gains, prejudgment interest is appropriate. *See Helms*, 2015 WL 5010298, at *20. Based on the evidence presented by the SEC and Defendants lack of a response contesting the evidence, the Court awards the requested amount of $38,787.04 for prejudgment interest against Fox.

    **c. Civil Penalty**

For Fox, the SEC asks the Court to order a one-time, third-tier civil penalty commensurate with the amount of Fox's pecuniary gain: $435,684.86. Here, Fox acted egregiously and participated in activities that involved fraud, deceit, and manipulation on a large scale in clear disregard of federal security laws. Specifically, Fox falsely inflated the financial health of the partnerships and hid the true status of the investments from investors. He used improper accounting practices by keeping sizeable expenses off the books and mischaracterizing commission payments and payments to his entity, Consolidated Energy. Fox furth aided Lewis by setting up a shell company to obtain money for AmeraTex and Lewis Oil Corp. Additionally, Fox used $88,572.50 of investor funds from the Consolidated Energy account for his personal use. Moreover, Fox's involvement in the scheme and violations resulted in substantial losses to the investors of nearly $12 million.

Due to the impropriety of Fox's actions, the Court finds it appropriate to impose a civil penalty on Fox for the amount the SEC requested: $435,684.86.

    **d. Permanent Injunction**

The SEC asks the Court to enjoin Fox from providing bookkeeping services, preparing financial statements, and preparing tax returns and K-1 statements for any oil and gas entities. As mentioned above, Fox acted egregiously in conducting aiding in the fraudulent scheme. To begin, Fox cooked the books to hide the true health of the entities and disguise the personal spending of himself, Lewis, and Fort. Fox prepared false K-1 statements that hid partnership losses from investors. Fox's accounting methods enabled the perpetuation of the scheme to defraud investors. His conduct was recurrent and egregious.

Further, the Court notes that Fox's behavior is likely to persist if not restrained by court order. Fox's conduct clearly illustrates a pattern of securities violations as well as a high likelihood of future violations. Following his time at AmeraTex, Fox began working for another oil and gas company, which could provide him the platform he needs to carry out another scheme to defraud investors. Left unchecked, Fox will likely continue to violate securities laws. Accordingly, a permanent injunction preventing Fox from providing bookkeeping services, preparing financial statements, and preparing tax returns and K-1 statements for any oil and gas entities is warranted. *See Helms*, 2015 WL 5010298, at *18; *Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d at 369; *Fox*, 4:17-CV-271, 2018 WL 1210858, at *4.

## CONCLUSION

It is therefore **ORDERED** that the SEC's Motion for Remedies and for Entry of Final Judgement (Dkt. #75) is hereby **GRANTED.**

Individual final judgments will be entered separately for each defendant.

**IT IS SO ORDERED.**

**SIGNED this 18th day of March, 2021.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE